## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Gary Tews et al.,**

**Plaintiffs,**

**v.**                                              **Case No. 08-2064-JWL**

**Renzenberger, Inc.,**

**Defendant.**

## <u>MEMORANDUM & ORDER</u>

Plaintiffs, individuals currently or formerly employed by defendant Renzenberger, Inc. as road drivers, filed this suit on behalf of themselves and others similarly situated seeking overtime compensation pursuant to the Fair Labor Standards Act (FLSA), 29 U.S.C. § 207.  In July 2008, the court conditionally certified this case as a collective action under 29 U.S.C. § 216(b) on behalf of all road drivers who worked for defendant at any time from August 10, 2005 to the present, other than those individuals who were employed as road drivers exclusively in California during that time period.

Defendant does not dispute that it is a covered employer for purposes of the FLSA, does not dispute that plaintiffs often worked more than 40 hours per workweek and does not dispute that it has not paid overtime compensation to plaintiffs.  According to defendant, plaintiffs, at all pertinent times, have been exempt from the overtime provisions of the FLSA.  Indeed, it is undisputed by the parties that plaintiffs, until August 10, 2005, were exempt from the FLSA's overtime provisions under the "motor carrier" exemption.  29 U.S.C. § 213(b)(1).  On August

10, 2005, the Motor Carrier Act was amended in certain respects such that plaintiffs contend the motor carrier exemption ceased applying to them on that date.  Defendant contends that the motor carrier exemption continued to apply to plaintiffs after August 10, 2005.  Defendant concedes, however, that Congress, in June 2008, effectively eliminated the availability of the motor carrier exemption for employees operating non-commercial motor vehicles in interstate commerce such that, beginning in June 2008, the motor carrier exemption no longer applies to the vast majority of plaintiffs.  Nonetheless, defendant has continued to deny overtime compensation to plaintiffs on the grounds that, regardless of the applicability of the motor carrier exemption, plaintiffs at all times have been and remain exempt from the overtime provisions of the FLSA by virtue of the rail carrier exemption, 29 U.S.C. § 213(b)(2).

The parties have filed cross-motions for summary judgment asking the court to resolve whether plaintiffs are exempt from the overtime provisions of the FLSA under the rail carrier exemption.  In their motion for summary judgment, plaintiffs also ask the court to resolve whether plaintiffs, beginning on August 10, 2005, are exempt from the overtime provisions of the FLSA under the motor carrier exemption.  The parties recognize, of course, that the court need not address the motor carrier exemption if it concludes that plaintiffs are exempt from the overtime provisions of the FLSA under the rail carrier exemption.

## I.    Facts

Defendant Renzenberger, Inc., a Kansas corporation headquartered in Lenexa, Kansas, provides rail crew transportation services by motor vehicle to railroads, including Norfolk

Southern Railway, Union Pacific Railroad and Burlington Northern & Santa Fe Railroad. Defendant's sole business is the provision of rail crew transportation services and it offers such services only to the railroad industry.  It does not offer its services to the general public and, in fact, defendant's contracts with its railroad clients prohibit defendant from transporting anyone other than railroad employees.

Plaintiffs in this case are current and former "road drivers" employed by defendant. Defendant's road drivers are primarily responsible for transporting rail crews, primarily engineers and conductors, by motor vehicle to and from various destinations.  Because road drivers are most often utilized to "relieve" rail crews who have exhausted their federally mandated maximum hours of service and to replace those crews with "fresh" crews, road drivers provide motor vehicle transportation services to and from rail yards, hotels and any number of random points along a rail line, generally within a 250-mile radius of a terminal area.[1]   In performing their jobs, road drivers travel on public highways and cross state lines as their trips require.

Defendant's road drivers typically transport rail crews in vans that seat eight or fewer passengers, including the driver.  Some road drivers, however, operate larger vans (deemed "commercial motor vehicles") on some occasions.  Commercial motor vehicles, however, make up only four percent of defendant's fleet of vehicles.  In other words, ninety-six percent of

---

[1]In contrast, defendant's "yard drivers" transport rail crews within the confines of rail yards.

defendant's vehicles seat no more than eight passengers.

## II.    Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In applying this standard, the court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *Clements v. Serco, Inc*., 530 F.3d 1224, 1227 (10th Cir. 2008) (citing *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1222-23 (10th Cir. 2008)).  In addition, exemptions under the FLSA must be "narrowly construed" against the employers seeking to assert them in light of the FLSA's "broad remedial aims."  *Id*. (quoting *Ackerman v. Coca-Cola Enters*., 179 F.3d 1260, 1264 (10th Cir. 1999)); *accord Rodriguez v. Whiting Farms, Inc*., 360 F.3d 1180, 1184 (10th Cir. 2004).  Further, as the employer, defendant bears the burden of proving that plaintiffs fit "plainly and unmistakably" within the terms and spirit of the asserted exemption.  *Clements*, 530 F.3d at 1227; *Rodriguez*, 360 F.3d at 1184.

Accordingly, defendant is not entitled to summary judgment unless it can establish that the undisputed facts (or plaintiffs' version of any disputed facts) plainly and unmistakably fit within the asserted exemption.  *See Welding v. Bios Corp*., 353 F.3d 1214, 1218 (10th Cir. 2004).  If there are genuine and material factual disputes such that defendant could meet its burden of proof only if the jury resolved the factual disputes in its favor, then the matter is not appropriate for summary judgment and it should proceed to trial. *See id.*  If, however, the summary judgment record, when construed most favorably to defendant, does not clearly and

4

unmistakably establish the asserted exemption, then summary judgment may be entered for the appropriate plaintiffs. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986)).

### III. Rail Carrier Exemption

All parties move for summary judgment on the issue of whether plaintiffs are exempt from the overtime provisions of the FLSA under the rail carrier exemption, 29 U.S.C. § 213(b)(2). Under § 213(b)(2), the overtime provisions of the FLSA do not apply to "any employee of an employer engaged in the operation of a rail carrier subject to part A of subtitle IV of Title 49."[2] Defendant urges that its road drivers clearly fit within the exemption because defendant unquestionably is "engaged in the operation of a rail carrier." According to defendant, its services are indispensable to the operation of its clients who are "rail carriers subject to part A of subtitle IV of Title 49." Plaintiffs, on the other hand, contend that a proper reading of § 213(b)(2) requires defendant to establish that it is "subject to part A of subtitle IV of Title 49," not simply that it provides indispensable services to railroads who are subject to part A of subtitle IV of Title 49. The legislative history underlying the rail carrier exemption supports plaintiffs' interpretation of the exemption.[3]

---

[2]Part A of subtitle IV of Title 49 concerns the regulation of rail transportation.

[3]The court examines the legislative history of the exemption only because the exemption's plain language is ambiguous as to whether the phrase "subject to part A of subtitle IV of Title 49" references the "employer" or the "rail carrier." *See Russell v. United States*, ___ F.3d ___, 2008 WL 5264733, at *3 (10th Cir. Dec. 19, 2008) (court looks to the

A.      *Legislative History of the Rail Carrier Exemption*

When the FLSA was enacted in 1938, the rail carrier exemption exempted from the overtime provisions of the FLSA "any employee of an employer subject to the provisions of part 1 of the Interstate Commerce Act." *See Magnussen v. Ocean S.S. Co. of Savannah*, 162 F.2d 77 (2d Cir. 1947); *accord Cederblade v. Parmelee Transp. Co.*, 166 F.2d 554, 555 (7th Cir. 1948). Part 1 of the Interstate Commerce Act, sections 1 through 27 of Title 49 of the United States Code, regulated railroad operations. *See Cederblade*, 166 F.2d at 555. As explained in some detail by the district court in *Keele v. Union Pacific Railroad Co.*, 78 F. Supp. 678 (S.D. Cal. 1948), when the FLSA was first introduced in the Senate in 1937, the Act's provisions included all railroad employees with the exception of those employees employed in an executive, professional or administrative capacity. *Id.* at 681. The railroad industry objected to the inclusion of railroad employees. *Id.* Ultimately, the rail carrier exemption was proposed to address the objection of the railroad industry. *See id.* at 681-82. Supporting the amendment, one congressman explained:

> For a long period of time the House has eliminated railroad workers from various acts which apply to industrial workers. This was done in the case of the Wagner Labor Relations Act, again in the passage of the Social Security Act, and prior to that in the passage of the National Recovery Act. The railroads and the railroad industry have their own social and labor legislation. As you know, they have the Adamson Hours of Service Act, the Railroad Labor Act with its Mediation and Arbitration Boards, and they have the Railroad Retirement Act. Therefore there is sufficient precedent for the committee to accept the amendment of the distinguished gentleman from Ohio  and in doing so eliminate all railroad workers

_____

legislative history and underlying public policy of a statute to determine Congressional intent if the statute's plain language is ambiguous).

from the provisions of this bill.

*Id*. at 682 (citations omitted).  The amendment was adopted but, as finally enacted, applied only to the overtime provisions of the FLSA as opposed to all of its provisions as originally provided in the proposed amendment.  *Id*.

Early cases addressing the scope of the rail carrier exemption adhered to the intent of Congress that the exemption be limited to employees of employers subject to regulation by the Interstate Commerce Commission.  *See id.* at 682-83 (rail carrier exemption "means exactly what it says" and plaintiffs were clearly exempt because the defendant was regulated under part 1 of the Interstate Commerce Act).  As noted by the district court in *Walling v. Rockton & Rion Railroad*:

> The language of Section 13(b)(2), as well as its legislative history, shows that the exemption was inserted to avoid duplication of Federal regulatory authority over the hours of employment of railroad workers.  Certainly it was not intended by this exemption to exclude a carrier not subject to regulation by the Interstate Commerce Commission.

54 F. Supp. 342, 347 (D.S.C. 1944); *accord McComb v. S. Weighing & Inspection Bureau*, 170 F.2d 526, 529 (4th Cir. 1948) ("It was manifestly intended that exclusive power to regulate hours of labor for employees of railroads should rest with the Interstate Commerce Commission and that there should be no division of responsibility for supervising the operations of interstate carriers, a matter where unity of control was of the utmost importance and where it had been exercised by the commission for a long period to the entire satisfaction of the country at large.") (exemption applied where defendant clearly was subject to part 1 of the Interstate Commerce Act).

7

In 1974, the rail carrier exemption of the FLSA was modified by inserting the phrase "engaged in the operation of a common carrier by rail and" after the word "employer."  Pub. L. No. 93-259, § 23(c), 1974 U.S.C.C.A.N. 55, 72.  Thus, the exemption as modified exempted from the overtime provisions of the FLSA "any employee of an employer engaged in the operation of a common carrier by rail and subject to the provisions of part 1 of the Interstate Commerce Act."  The express purpose of the amendment was to modify the exemption only "insofar as it relates to pipeline employees." *Id*.  Prior to the amendment, pipeline employees fell within the exemption because pipeline companies engaged in the interstate transportation of oil were subject to part 1 of the Interstate Commerce Act.  *See Schmitt v. War Emergency Pipelines*, 175 F.2d 335, 337-38 (8th Cir. 1949).  The amendment, then, was intended to narrow the scope of the exemption to exclude pipeline employees, thereby expanding the applicability of the overtime provisions.  Pub. L. No. 93-259, 1974 U.S.C.C.A.N. 2811, 2824, 2858 (noting that the amendment to section 13(b)(2) is intended to repeal the overtime exemption for employees of oil pipeline transportation companies).

Subsequent modifications to the rail carrier exemption made no substantive change to the exemption.  In 1995, as part of the Interstate Commerce Commission Termination Act, the rail carrier exemption was modified to utilize the newly minted phrase "rail carrier" and to track the reorganization of the law referenced within the exemption.  Specifically, the ICC Termination Act of 1995 struck the phrase "common carrier by rail and subject to the provisions of part 1 of the Interstate Commerce Act" and inserted the phrase "rail carrier subject to part A of subtitle IV of title 49, United States Code."  ICC Termination Act, Pub. L. No. 104-88, § 340, 109 Stat.

803, 955 (1995); *id* § 102(a) (setting forth amended subtitle IV of Title 49, including definition of "rail carrier").

Defendant's reliance on the phrase "engaged in the operation of rail carrier" to support its contention that its employees fall within the rail carrier exemption is misplaced.  Quite clearly, that phrase was intended to narrow the scope of the exemption to exclude pipeline employees and was not intended to extend the exemption beyond those employees of employers "subject to the provisions of part 1 of the Interstate Commerce Act."  There is simply nothing in the legislative history or case law supporting a reading of the exemption broad enough to include employers who are not themselves subject to the provisions of part A of subtitle IV of Title 49.[4]  Thus, for its road drivers to fall within the rail carrier exemption, defendant must establish that it is subject to the provisions of  part A of subtitle IV of Title 49.

B.      *Whether Defendant is "Subject to Part A of Subtitle IV of Title 49"*

As the foregoing analysis illustrates, plaintiffs are exempt from the overtime provisions of the FLSA only if defendant is "subject to part A of subtitle IV of Title 49."  29 U.S.C. § 213(b)(2).  The parties agree that defendant can demonstrate that it is subject to part A of subtitle IV of Title 49 in one of two ways.  First, it can demonstrate that its activities constitute

---

[4]Defendant relies on two cases that it believes supports its broad reading of the rail carrier exemption.  Those cases, *Cederblade v. Parmelee Transportation Co.*, 166 F.2d 554 (7th Cir. 1948) and *Williams v. Alex's Transportation, Inc.*, 969 F. Supp. 1142 (N.D. Ill. 1997), are discussed by the court below in connection with the "terminal area" exception to jurisdiction under the Motor Carrier Act.  As will be explained, *Cederblade* does not support defendant's construction of the exemption and *Williams* is not persuasive to the court.

"transportation by rail carrier."   49 U.S.C. 10501(a) (Surface Transportation Board has jurisdiction over transportation by rail carrier).  Second, it can demonstrate that its activities fall within the "terminal area" exception to jurisdiction under the Motor Carrier Act.  49 U.S.C. § 13503(b)(1) & (2) (transportation by motor vehicle in a terminal area is subject to jurisdiction under chapter 105 when provided for a rail carrier).

1.      "Transportation by Rail Carrier"

Under part A of subtitle IV of Title 49, "transportation by rail carrier" is subject to regulation by the Surface Transportation Board.  49 U.S.C. § 10501(a).  To establish that it is subject to the Board's jurisdiction, then, defendant must show both that the activities at issue constitute "transportation" and that such transportation is performed by, or under the auspices of, a "rail carrier."  *See Town of Babylon & Pinelawn Cemetery*, STB Fin. Dkt. No. 35057, 2008 WL 275697, at *3 (Feb. 1, 2008).  "Transportation" is defined in the statute as follows:

> (A) a locomotive, car, vehicle . . . or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and

> (B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers or property.

49 U.S.C. § 10102(9).  The phrase "rail carrier" is defined as "a person providing common carrier railroad transportation for compensation."  *Id*. § 10102(5).

Asserting that its activities constitute "transportation by rail carrier," defendant focuses exclusively on the Surface Transportation Board's interpretation of the phrase "rail carrier" to

include non-carriers whose services are "integral" to the rail carrier's transportation service and non-carriers over whom a rail carrier exerts control, *see Town of Babylon & Pinelawn Cemetery*, STB Docket No. 35057, 2008 WL 275697 (Feb. 1, 2008), and then urges that its services are integral to its rail carrier customers' transportation services and that its customers exert control over its operations. These arguments, however, ignore that the Board's jurisdiction over "rail carriers" is limited to common carriers. *Ass'n of P&C Dock Longshoremen v. Pittsburgh & Conneaut Dock Co.*, 8 I.C.C. 2d 280, 293-94 (1992). In other words, whatever service the non-carrier is providing–no matter how "integral" to the rail carrier or whether the rail carrier exerts control over the non-carrier's operations–must be publicly available. *Id.*; *accord H&M Int'l Transp., Inc.*, STB Fin. Dkt. No. 3427, 2003 WL 22674651, at *3 (Nov. 10, 2003) ("To be considered a rail carrier under the statute, there must be a holding out to the public to provide common carrier service."). It is not necessary that the entity directly offer its services to the public as long as "the questioned service is part of the total rail common carrier service that is publicly offered, then the agent providing it for the offering railroad, whether through common ownership or contract is deemed to hold itself out to the public." *P&C Dock*, 8 I.C.C. 2d at 294.

None of the rail carriers with whom defendant contracts publicly offers defendant's services as part of its complete common carrier rail transportation service. Indeed, defendant's contracts with its rail carrier customers prohibit defendant from transporting anyone other than railroad employees and it is undisputed that defendant has not transported any member of the public in the class period. Defendant, then, is not a "rail carrier" for purposes of STB jurisdiction. *See Town of Milford*, STB Fin. Dkt No. 34444. 2004 WL 1802301 (Aug. 12, 2004)

(Board lacked jurisdiction over noncarrier operating a rail yard where it transloaded steel pursuant to an agreement with the carrier but the transloading services were not being offered as part of common carrier services offered to the public).

2.      The "Terminal Area" Exception

By virtue of an exception to the Secretary of Transportation's jurisdiction under the Motor Carrier Act, the Surface Transportation Board has the authority to regulate "transportation by motor vehicle in a terminal area" when the transportation "is a transfer, collection, or delivery" and is provided by "an agent or under other arrangement" for a "rail carrier subject to jurisdiction under chapter 105." 49 U.S.C. § 13503(b).  Defendant contends that it is subject to the Board's jurisdiction by virtue of this "terminal area" exception.  Plaintiffs, on the other hand, argue that defendant's activities do not satisfy the exception, noting that road drivers perform work well beyond the confines of terminal areas and, in any event, do not provide "transfer, collection, or delivery" services.  Because the court concludes that defendant's transportation services are not limited to terminal areas, rendering the exception inapplicable, the court declines to address whether defendant provides "transfer, collection or delivery" services.

The historical underpinnings of the terminal area exception were explained by the Seventh Circuit in *Cederblade v. Parmelee Transportation Co.*, 166 F.2d 554 (7th Cir. 1948). In *Cederblade*, the defendant transported via buses and trucks railroad passengers and their baggage (what the Seventh Circuit called "collection and delivery service") from depot to depot in Chicago.  *Id*. at 554.  The plaintiffs–employed by defendant as drivers of the buses and

trucks–sued for unpaid overtime compensation under the FLSA. *Id*. at 554-55. The district court dismissed the plaintiffs' complaint and the Seventh Circuit affirmed that decision, concluding that the plaintiffs were exempt from overtime pay pursuant to the rail carrier exemption. *Id*. at 555.

As explained by the Circuit, the Interstate Commerce Commission, since 1912, had exercised its power over collection and delivery services by motor vehicle within railroad terminal areas under Part I of the Interstate Commerce Act. *Id*. (citing *American Trucking Ass'ns v. United States*, 17 F. Supp. 655, 657 (D.D.C. 1936) ("railroad terminal service by motor truck" was subject to regulation under the Interstate Commerce Act). Consistent with this practice, the Motor Carrier Act of 1935 (then known as Part II of the Interstate Commerce Act) evidences that Congress did not intend to include within the Act all interstate motor vehicle operations because some such operations were already subject to the jurisdiction of the ICC under Part I of the Interstate Commerce Act. *Id*. (noting that Motor Carrier Act of 1935 defined a common carrier by motor vehicle to include all such interstate or foreign commercial carriers "except to the extent that these operations are subject to the provisions of part I").

Indeed, the Interstate Commerce Commission itself interpreted this exception to jurisdiction in the Motor Carrier Act of 1935 as entirely consistent with its findings that collection and delivery services "within terminal districts" are excluded from Part II of the Interstate Commerce Act but that "intercity motor vehicle operations of railroads" are included under that part. *Scott Bros., Inc*., 4. M.C.C. 551, 552 (1938). As explained by the Commission in *Scott Brothers*:

13

> It was well known to Congress that the Commission had made a distinction with reference to "such motor vehicle operations of carriers by rail," to the effect that those which were performed in connection with terminal service were subject to its jurisdiction under part I, whereas those which were of a line-haul or intercity character were not so subject.  The plain intent was to make it clear that the latter should be subject to our jurisdiction under part II, but that the former should remain subject to the provisions of part I.

*Id.* at 556.  In *Cederblade*, the Seventh Circuit noted that the services rendered in the case before it were analogous to those rendered in *Scott Brothers*–that is, "they were collection and delivery services within terminal areas" that were subject to jurisdiction under part I of the Interstate Commerce Act as part of "railroad operations."  166 F.2d at 555.

In 1940, the Motor Carrier Act was expressly amended by the Transportation Act of 1940 to reflect that transportation by motor vehicle for a common carrier by railroad "in the performance within terminal areas of transfer, collection, or delivery service" was to be considered and regulated as "transportation by railroad . . . to which such services are incidental."  *Id*. at 555-56.  This amendment, then, "clarified and confirmed" the ICC's construction of the Act.  *Id*. at 556.  Ultimately, the Seventh Circuit, relying on the "terminal area" exception carved out by the ICC and codified in 1940, concluded that the services performed by the plaintiff-drivers in the case before it were "terminal area transportation by motor vehicle" and, as such, were to be considered as "transportation by the railroads" within the rail carrier exemption.  *Id*. ; *accord McComb v. Union Stock Yards & Transit Co. of Chi.*, 168 F.2d 375, 376-78 (7th Cir. 1948) (watchmen employed by defendant operating stockyards exempt from overtime pay because stockyards are, in effect, "railroad terminals" subject to jurisdiction under part I of the Interstate Commerce Act).

It is undisputed that defendant's road drivers are not confined to terminal areas in the performance of their jobs. Indeed, road drivers typically operate motor vehicles within a 250-mile radius of terminal areas. According to defendant, the mere fact that its road drivers operate within terminal areas from time to time is sufficient to bring it within the terminal area exception.[5] Defendant's expansive reading of the terminal area exception effectively renders the exception meaningless and, in any event, it is unsupported by both the text of the statute and the ICC's construction of the exception. *See United States v. Motor Freight Express*, 60 F. Supp. 288, 292-93 (D.N.J. 1945) (upholding cease and desist order and finding that pick-ups and deliveries outside the terminal area constituted intercity operations not authorized by the terminal area exception).

Indeed, the only case cited by defendant presenting facts analogous to the facts here and arguably supporting application of the rail carrier exemption is *Williams v. Alex's Transportation, Inc*., 969 F. Supp. 1142 (N.D. Ill. 1997). In that case, Alex's drivers, including the plaintiff, transported railroad crews from hotels and railyards to trains at various points along rail lines and traveled interstate to do so. *Id*. at 1143. Alex's refused to pay the overtime compensation, citing both the motor carrier exemption and the rail carrier exemption. *Id*. at 1144. The district court granted Alex's motion for summary judgment concerning the application of the motor carrier exemption, concluding that the undisputed facts established that

---

[5]Defendant also contends that its activities fit within the terminal area exception because defendant's yard drivers work exclusively within terminal areas. Defendant, however, has not explained how the services rendered by its yard drivers bear on the application of the rail carrier exemption to defendant's road drivers.

15

the exemption applied to the plaintiff.  *Id*. at 1145.

Although that holding disposed of the case, the district court, in dicta, discussed the application of the rail carrier exemption and noted its inclination "to find that the rail carrier exemption would also apply to Alex's to defeat Williams' claim." *Id*. at 1145-46.  Relying solely on *Cederblade*, the district court opined that Alex's "collection and delivery service" is "incidental" to a rail carrier such that Alex's would fall within the rail carrier exemption. *Id*. at 1146.  While the plaintiff in that case urged to the district court that *Cederblade* should be "limited to the 'collection and delivery services' of passengers and baggage 'within terminal areas,'" the court rejected this argument on the grounds that it was unable to locate any case "that limits the rail carrier exemption in this manner." *Id*.  The district court's statement, however, is somewhat puzzling, given that the rail carrier exemption does not limit its application to services performed within terminal areas–it is limited to employees of employers who are regulated as rail carriers or who perform services (including transfer, collection and delivery services provided by motor vehicle within a terminal area) that fall under the jurisdiction of the Surface Transportation Board.  The *Williams* case, then, is unpersuasive to the court both because its discussion of the rail carrier exemption is merely dicta and because the district court did not consider *Cederblade*'s express reliance on the "terminal area" exception in determining that the plaintiffs fell within the rail carrier exemption.

In the absence of any other argument from defendant concerning the applicability of the rail carrier exemption, summary judgment in favor of plaintiffs is warranted on this issue.

## IV.     Motor Carrier Act Exemption

Having concluded that plaintiffs are not exempt from the overtime provisions of the FLSA pursuant to the rail carrier exemption, the court turns to consider the applicability of the motor carrier exemption.  The overtime provisions of the FLSA do not apply to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49."  29 U.S.C. § 213(b)(1).  This exemption is commonly known as the Motor Carrier Act exemption, or the MCA exemption.  *Kellogg v. Energy Safety Servs. Inc*., 544 F.3d 1121, 1129 (10th Cir. 2008). Section 31502 of Title 49, in turn, states that the Secretary of Transportation may establish requirements for qualifications and maximum hours of service of employees of, and safety of operations and equipment of, a motor carrier."  49 U.S.C. § 31502(b)(1).  This specific grant of jurisdiction, however, is qualified by the Motor Carrier Act's general limitation on jurisdiction, which is limited, in pertinent part, to transportation in interstate commerce.  49 U.S.C. § 13501.

By definition, a "motor carrier" for purposes of § 31502(b)(1) has "the same meaning[] given th[at] term[] in section 13102 of this title."  49 U.S.C. § 31501(2).  Until August 10, 2005, § 13102 defined a "motor carrier" as a "person providing motor vehicle transportation for compensation."  Pub. L. No. 109-59, § 4142(a), 119 Stat.1747 (2005).  The phrase "motor vehicle," in turn, is defined as a "vehicle, machine, tractor, trailer, or semitrailer propelled or drawn by mechanical power and used on a highway in transportation."  49 U.S.C. § 13102(16). Thus, prior to August 10, 2005, the MCA exemption of the FLSA applied to most employees who drove any type and size of motor vehicle in interstate commerce, *Musarra v. Digital Dish,*

*Inc*., 454 F. Supp. 2d 692, 701 n.19 (S.D. Ohio 2006), and it is undisputed by plaintiffs that they were exempt from the overtime provisions of the FLSA prior to August 10, 2005 by virtue of the MCA exemption.

*A.      SAFETEA-LU Amendment*

Effective August 10, 2005, Congress, through the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU), amended the definition of "motor carrier" in § 13102 of title 49 by striking the phrase "motor vehicle" from the definition and inserting the phrase "commercial motor vehicle (as defined in section 31132)." Pub. L. No. 109-59, § 4142(a), 119 Stat.1747 (2005) (codified as amended at 49 U.S.C. § 13102(14)).  As a result, the definition of "motor carrier" in § 13102, after August 10, 2005, read as follows: "The term 'motor carrier' means a person providing commercial motor vehicle (as defined in section 31132) transportation for compensation." 49 U.S.C. § 13102(14).  Section 31132 defines a "commercial motor vehicle" as a:

> self-propelled or towed vehicle used on the highways in interstate commerce to transport passengers or property, if the vehicle–
>
> > (A) has a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds, whichever is greater;
> >
> > (B) is designed or used to transport more than 8 passengers (including the driver) for compensation;
> >
> > (C) is designed or used to transport more than 15 passengers, including the driver, and is not used to transport passengers for compensation; or

> (D) is used in transporting material found by the Secretary of
> Transportation to be hazardous under section 5103 of this title and
> transported in a quantity requiring placarding under regulations
> prescribed by the Secretary under section 5103.

49 U.S.C. § 31132(1).  After the passage of SAFETEA-LU, then, many employees who were previously exempt under the prior definition of "motor carrier" lost their exempt status because they did not operate "commercial motor vehicles."  *See Musarra*, 454 F. Supp. at 701 n.19.

Indeed, it is undisputed that the vast majority of plaintiffs in this case did not operate commercial motor vehicles during the relevant time period.  Plaintiffs, then, urge that summary judgment is appropriate with respect to these plaintiffs because the MCA exemption ceased applying to them after the SAFETEA-LU amendment.  Defendant argues that summary judgment is still inappropriate because plaintiffs remain exempt under the MCA exemption despite the SAFETEA-LU amendment.  According to defendant, the MCA exemption applies to all employees of a motor carrier so long as the motor carrier maintains some commercial motor vehicles in its fleet.  Defendant is undisputedly a "motor carrier" and undisputedly maintains commercial motor vehicles in its fleet of vehicles (although defendant readily admits that commercial motor vehicles make up only four percent of its fleet).  Under defendant's interpretation of the MCA exemption, then, whether any individual plaintiff in this case ever operated a commercial motor vehicle is entirely irrelevant to the question of whether the exemption applies after the SAFETEA-LU amendment.

In support of its interpretation of the Motor Carrier Act as it relates to the overtime exemption of § 213(b)(1), defendant relies on *Tidd v. Adecco USA, Inc*., 2008 WL 4286512 (D.

Mass. Sept. 17, 2008).  In that case, the district court concluded that because FedEx operated a fleet that included commercial motor vehicles, it qualified as a "motor carrier" under the SAFETEA-LU amendment such that the Secretary of Transportation had the power to regulate all of FedEx's drivers, regardless of whether those drivers actually operated commercial motor vehicles.  *Id.* at *4.  In so holding, the district court noted its belief that the language of the MCA exemption hinges more on "what the employer does" rather than on an "individual employee's daily work."  *Id*.  The court also found it unlikely that Congress intended a bifurcation of regulatory responsibilities between the Secretary of Transportation for an employer's employees operating commercial motor vehicles and the Secretary of Labor for the same employer's employees operating non-commercial motor vehicles.  *Id*. at *3 ("As a practical matter, dividing between agencies the responsibility for regulating maximum hours for similar employees of a given employer, while not impossible to conceive, as a practical matter would no doubt lead to a proliferation and complication of rules and enforcement.").

The district court in *Tidd*, however, did not discuss in its analysis what this court deems to be significant guidance from other courts and the Department of Labor concerning the scope of the MCA exemption and the Secretary of Transportation's jurisdiction.  As explained above, the Motor Carrier Act provides that the Secretary of Transportation may regulate the "qualifications and maximum hours of service of employees . . . of a motor carrier."  49 U.S.C. § 31502(b)(1).  The Supreme Court has held that the term "employees" for purposes of that section is "limited to those employees whose activities affect the safety of operation."  *United*

*States v. Am. Trucking Ass'ns*, 310 U.S. 534, 553 (1940).[6]  In determining whether a particular employee's activities affect the "safety of operation" of an employer for purposes of applying the exemption, the Seventh Circuit, in turn, has held that the employer's operations are not controlling and that the MCA exemption "depends upon the activities of the individual employees." *Goldberg v. Faber Indus., Inc.*, 291 F.2d 232, 235 (7th Cir. 1961).  In *Goldberg*, the Circuit reversed the district court's holding that because five out of twenty employee-drivers of an employer were engaged in interstate commerce, the Interstate Commerce Commission (ICC)[7] had the authority to regulate all twenty employee-drivers.  *Id.* at 234.  The Seventh Circuit concluded that the ICC had jurisdiction over the five drivers actually engaged in interstate commerce but not over the other fifteen drivers, emphasizing the significance of the nature of the work performed by a particular employee.  *Id.* at 235.

Relying in part on *American Trucking* and *Goldberg*, the Department of Labor has promulgated regulations concerning the scope of the MCA exemption.  29 C.F.R. § 782.2. Those regulations emphasize the significance of each individual employee's activities in ascertaining whether the exemption applies, *id.* § 782.2(a) (exemption depends both on class to which employer belongs and on class of work involved in employee's job), and clarify that the

---

[6]The Supreme Court analyzed the language of § 204 of the Motor Carrier Act.  That section is the predecessor to § 31502.  *See Packard v. Pittsburgh Transp. Co.*, 418 F.3d 246, 251 (3rd Cir. 2005).

[7]In 1995, Congress abolished the ICC and transferred most of its responsibilities to the Secretary of Transportation.  *See Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 759 n.1 (2004).

exemption "extends only to those employees who engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act." *Id.*

In *Vidinliev v. Carey Int'l, Inc.*, 2008 WL 4500167 (N.D. Ga. Oct. 3, 2008), the district court examined *American Trucking* and the pertinent DOL regulations in the context of analyzing the scope of the MCA exemption in the aftermath of the SAFETEA-LU amendment. In so doing, the district court reasoned that the DOL regulations, although issued prior to SAFETEA-LU, nonetheless provided sound guidance for determining the scope of the MCA exemption after SAFETEA-LU simply by substituting "commercial motor vehicle" for "motor vehicle" in the text of the regulation. *Id.* at *9. According to the district court, then, the defendant would be entitled to the exemption only if it showed that the plaintiffs were "involved in interstate commercial motor vehicle transportation." *Id.* at *10; *accord McGee v. Corporate Exp. Delivery Sys.*, 2003 WL 22757757, at *1 (N.D. Ill. Nov. 20, 2003) (defendant would be entitled to summary judgment on MCA exemption only if it came forward with evidence "that each plaintiff was engaged in activities that are covered by the motor carrier exemption"). Ultimately, the district court concluded that genuine issues of material fact precluded summary judgment for either party because the record evidence was inconclusive as to the nature and extent of the activities of each individual plaintiff. *Vidinliev*, 2008 WL 4500167, at *11.

Like FedEx in *Tidd,* the defendant in *Vidinliev* argued that the SAFETEA-LU amendment required it to show only that it had some commercial motor vehicles in its fleet regardless of

whether any particular plaintiff operated a commercial motor vehicle. *Id*. The district court rejected this argument:

> [I]f this were true, then a motor carrier could buy one commercial motor vehicle and thereafter all of its drivers would be exempt from overtime pay, no matter how remote or infrequent the possibility of an interstate trip in a commercial motor vehicle. . . . Evidence regarding the makeup of Carey Atlanta's vehicle fleet simply does not conclusively determine the character of the plaintiffs' activities.

*Id*. The court finds the reasoning of the *Vidinliev* court more persuasive than the *Tidd* court's analysis, particularly when viewed in the full context of the pertinent statutory language, the cases analyzing that language and the regulations that build on those cases. The court, then, rejects defendant's argument that the mere presence of commercial motor vehicles in its fleet renders all employee-drivers exempt under the MCA exemption. *See McGee*, 2003 WL 22757757, at *3 ("The activities of one plaintiff cannot justify a blanket exemption for the other . . . plaintiffs.").

**B.**   *Technical Corrections Act of 2008*

Defendant next contends that any rights plaintiffs may have had to overtime pay after August 10, 2005 based on the SAFETEA-LU amendment to the definition of "motor carrier" were extinguished on June 6, 2008 with the enactment of the SAFETEA-LU Technical Corrections Act of 2008. Pub. L. No. 110-244, 122 Stat. 1572 (2008). For purposes of this case, the Technical Corrections Act modified existing law concerning motor carriers in two significant respects. First, the Technical Corrections Act restored the definition of "motor carrier" to its pre-SAFETEA-LU state. In other words, Congress again amended the definition of "motor carrier"

in § 13102 of title 49–this time by striking the phrase "commercial motor vehicle (as defined in section 31132)" and inserting the phrase  "motor vehicle."  Pub. L. No. 110-244, § 305(c), 122 Stat. 1620 (2008).   Second, the Technical Corrections Act effectively modified the MCA exemption of the FLSA by affirming that the overtime provisions of the FLSA apply to employees of a motor carrier who, in pertinent part, drive motor vehicles on public highways in interstate commerce so long as those motor vehicles weigh 10,000 pounds or less and transport eight or less passengers.  Pub. L. No. 110-244, § 306(a) & (c), 122 Stat. 1620 (2008).  In light of this second modification, the parties do not dispute that, beginning June 6, 2008, the MCA exemption does not apply to the vast majority of plaintiffs (*i.e.*, those plaintiffs who did not operate commercial motor vehicles during the relevant period).

With respect to the first significant modification–the return to the original definition of "motor carrier"–defendant contends that Congress meant for the Technical Corrections Act modification to apply retroactively such that the original definition of "motor carrier" applies to claims even after August 10, 2005.  The retroactivity of a statute is a question of law.  *Valdez-Sanchez v. Gonzales*, 485 F.3d 1084, 1088 (10th Cir. 2007) (citing *Hem v. Maurer*, 458 F.3d 1185, 1189 (10th Cir. 2006)).  In *Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1994),  the Supreme Court established a two-part test for determining whether a statute applies retroactively.  *Id*.  First, the court ascertains whether Congress expressed its intentions as to the temporal reach of the statute.  *Id*.  (citing *Landgraf*, 511 U.S. at 280).  If the court cannot ascertain congressional intent, it moves "to the second step of the *Landgraf* analysis and consider[s] whether the statute has a retroactive effect."  *Id*. (citing *Landgraf*, 511 U.S. at 280).  A statutory provision has a

"retroactive effect" when its application impairs rights a party possessed when he acted, increases a party's liability for past conduct, or imposes new duties or new disabilities with respect to transactions already completed. *Id.* (citing *Landgraf*, 511 U.S. at 280). If application of the statute creates a retroactive effect, "our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result." *Id.*

In support of its argument that § 305 of the Technical Corrections Act applies retroactively, defendant focuses on § 121(b)(2) of the Technical Corrections Act, Pub. L. No. 110-244, § 121(b)(2), 122 Stat. 1608 (2008), which states that "Each provision of the [SAFETEA-LU] (including the amendments made by that Act) (as in effect on the day before the date of enactment of this Act) that is amended by this Act . . . shall be treated as not being enacted." The court cannot conclude that Congress, by virtue of the language in § 121 of the Technical Corrections Act, clearly and unambiguously intended for § 305 to apply retroactively. Significantly, § 306(b) of the Technical Corrections Act includes a one-year safe harbor from liability for overtime pay following SAFETEA-LU for employers who did not have actual knowledge of the pertinent SAFETEA-LU amendments. Of course, if Congress intended for § 305 to apply retroactively, the one-year safe harbor in § 306 is "nothing more than surplusage." *Vidinliev v. Carey Int'l, Inc.*, 2008 WL 4500167, at *8 (N.D. Ga. Oct. 3, 2008) (concluding that Technical Corrections Act does not apply retroactively, in part because of one-year safe harbor); *accord Loyd v. Ace Logistics, LLC*, 2008 WL 5211022, at *7-8 (W.D. Mo. Dec. 12, 2008) (following the reasoning set forth in *Vidinliev* and concluding that the Technical Corrections Act does not apply retroactively). Thus, applying § 305 retroactively would violate a fundamental

canon of statutory construction that every clause and word of a statute must be given effect, if possible. *See Hackwell v. United States*, 491 F.3d 1229, 1235 (10th Cir. 2007).[8]   In light of the one-year safe harbor provision contained in § 306, and in the absence of any clear indication that Congress intended for § 305 to apply retroactively, the court must conclude–consistent with every other court that has decided the issue–that § 305 does not apply retroactively. *See Villegas v. Dependable Constr. Servs., Inc.*, 2008 WL 5137321, at * 21 n.9 (S.D. Tex. Dec. 8, 2008) (because court must presume that all words of statutes are intended to have meaning, "the Court will conclude that § 305 does not apply retroactively" in light of one-year defense to liability); *Veliz v. Cintas Corp.*, 2008 WL 4911239, at *4-5 (N.D. Cal. Nov. 13, 2008) (same).

Lastly, defendant contends that even if the court concludes that the makeup of defendant's vehicle fleet does not render its employees exempt and that § 305 does not apply retroactively, then the safe-harbor provision of § 306 shields defendant from liability from August 10, 2005 through February 2006–the time when defendant first learned of the SAFETEA-LU amendments.  According to defendant, plaintiffs have not disputed the fact that defendant did not learn about the amendments until February 2006 and, as a result, the court should conclude

---

[8]While defendant acknowledges that the one-year safe harbor is entirely inconsistent with the retroactive application of § 305, it surmises that the one-year safe harbor and the language in § 121 are "the result of competing versions of the bill which were not reconciled in the final version."  Defendant offers no support for this conclusion and to suggest that the court interpret § 121 in a way that renders the safe harbor in § 306 a nullity is at odds with basic rules of statutory construction.  *Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 249 (1985) (elementary canon of statutory construction is that statute should be interpreted so as not to render one part inoperative).

that defendant cannot be held liable for overtime compensation prior to February 2006. The court declines to render any ruling on the applicability of the safe-harbor provision at this juncture. Significantly, defendant did not move for summary judgment on this issue and only raised it in response to plaintiffs' motion. Plaintiffs have not conceded applicability of the safe-harbor provision but only conceded for purposes of its own motion for summary judgment that defendant's corporate designee testified that the company did not learn about the SAFETEA-LU amendments until February 2006. For these reasons, the issue is not ripe for the court's resolution.

Having concluded that the applicability of the motor carrier exemption turns on the activities of each individual plaintiff (as opposed to the makeup of defendant's vehicle fleet) and having rejected defendant's retroactivity argument, the court turns to the summary judgment evidence concerning the activities of each plaintiff for purposes of determining whether summary judgment is appropriate for either party. Although plaintiffs highlight that the class notice in this lawsuit expressly limits eligibility for the class to those drivers who drove a vehicle that seated 8 or less passengers (in other words, a non-commercial motor vehicle), defendant points out that the notice does not require plaintiffs to have operated non-commercial motor vehicles exclusively. Indeed, defendant has come forward with evidence that at least 290 plaintiffs operated commercial motor vehicles during the relevant time period. This evidence is sufficient to preclude summary judgment with respect to those plaintiffs. It is insufficient to warrant summary judgment in favor of defendant, however, because the record does not reflect, by way of example, whether the plaintiffs operated commercial motor vehicles in interstate

commerce and whether the plaintiffs might nonetheless be entitled to overtime for weeks in which they operated non-commercial motor vehicles.

With respect to the remaining plaintiffs (that is, those plaintiffs who have never operated a commercial motor vehicle), defendant suggests that summary judgment is premature because these plaintiffs "may have worked in locations where they could reasonably have been expected to drive vehicles that seat 9 or more passengers" and the parties have not yet engaged in discovery on this issue. *See Morris v. McComb*, 332 U.S. 422 (1947) (motor carrier need not prove that each plaintiff actually participated in interstate transportation so long as some drivers made interstate trips and plaintiffs could reasonably been expected to make one of those interstate trips).  Defendant, however, has not filed a Rule 56(f) affidavit seeking to delay the entry of summary judgment, *see Campfield v. State Farm Mut. Auto Ins. Co.*, 532 F.3d 1111, 1124-25 (10th Cir. 2008) ("Where a party opposing summary judgment . . . fails to take advantage of the shelter provided by Rule 56(f) by filing an affidavit, there is no abuse of discretion in granting summary judgment if it is otherwise appropriate."), and it would appear that any pertinent documents or other information bearing on whether plaintiffs could reasonably be expected to operate a commercial motor vehicle would be in the control of defendant. Moreover, as highlighted by plaintiffs, it is highly unlikely that the vast majority of plaintiffs could reasonably have been expected to operate a commercial motor vehicle where those vehicles make up only four percent of defendant's fleet and there is no evidence that defendant assigned its commercial motor vehicles to its road drivers on an indiscriminate basis.  Defendant, then, has not met its burden of showing that the MCA exemption applied after August 10, 2005

to those plaintiffs who did not operate a commercial motor vehicle during the relevant period.[9]

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs' motion for partial summary judgment (doc. 158) is granted in part and denied in part and defendant's motion for summary judgment (doc. 161) is denied.

**IT IS SO ORDERED.**

Dated this 6th day of January, 2009, at Kansas City, Kansas.

a/ John W. Lungstrum
John W. Lungstrum
United States District Judge

---

[9]The court leaves to the parties the issue of which particular plaintiffs fall into this category.